UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD WREN,                        :
                                     :CIVIL ACTION NO. 3:11-CV-1769
          Plaintiff,                 :
                                     :(JUDGE RICHARD P. CONABOY)
          v.                         :
                                     :
COUNTY OF LUZERNE,                   :
MARYANNE PETRILLA and                :
STEPHEN E. URBAN,                    :
                                     :
          Defendants.                :
                                     :

---

## MEMORANDUM

Here we consider Defendants' County of Luzerne, Maryanne C. Petrilla and Stephen A. Urban's Motion for Summary Judgment (Doc. 20) filed on November 6, 2012. Defendants filed their Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment (Doc. 23), Brief in Support of Their Motion for Summary Judgment (Doc. 24), and Appendix of Exhibits (Doc. 25) on November 20, 2012. Plaintiff filed his opposition brief (Doc. 28), accompanied by Plaintiff's Response to Defendants' Statement of Material Fact in Support of Motion for Summary Judgment and Counterstatement of Facts (Doc. 29) on December 21, 2012. Defendants filed Defendants' Response to Plaintiff's Counterstatement of Facts (Doc. 34) and their Reply Brief in Support of Their Motion for Summary Judgment (Doc. 35) on January 18, 2013. Therefore, this matter is fully briefed and ripe for disposition. For the reasons discussed below, Defendants' motion is granted in part, denied in part, and held in abeyance in part.

# I. Background

On July 13, 2005, Plaintiff was appointed to the position of Director of Veterans' Affairs in Luzerne County by former Commissioners Gregory Skrepenak, Todd Vonderhied, and Stephen Urban. (Doc. 23 ¶ 5; Doc. 29 ¶ 5.) The position of Director of Veterans' Affairs is a full-time, non-union position. (Doc. 23 ¶ 6; Doc. 29 ¶ 6.) Plaintiff was offered a starting salary of $42,000, but only took a salary between $32,000 and $33,000 because he was receiving disability retirement benefits from Tobyhanna Army Depot ("Depot"), which program restricts a participating retiree from earning a salary greater than eighty percent of his base pay of the last year of his employment at the Depot as a condition to receiving the same level of benefit. (Doc. 23 ¶ 7; Doc. 29 ¶ 7.)

When hired, Plaintiff was not provided with instructions on how to perform his job. (Doc. 28 ¶ 8; Doc. 29 ¶ 8.) Plaintiff was told by County Manager Sam Gusto to do what was needed to take care of Luzerne County veterans. (Doc. 23 ¶ 9; Doc. 29 ¶ 9.) Plaintiff wrote up policies (Doc. 23 ¶ 10) which he characterizes as "shop operating policies" ("SOP") dealing with office day-to-day operations (Doc. 20 ¶ 10). Whatever policies Plaintiff would have written would have pertained to his own department and centered around his own employees. (Doc. 29 CMF ¶ 10; Doc. 34 ¶ 10.)[1]

---

[1] "CMF" refers to Plaintiff's Counterstatement of Material Facts. (Doc. 29 at 8-22.)

Plaintiff's duties included, generally, 1) the management of the office including budget preparation and control, purchasing, equipment and maintenance; 2) ensuring compliance with current County, federal and state veterans' benefits; 3) supervising the processing of all applications for veterans' benefits, determining eligibility and verifying the type and amount of benefits; 4) attending meetings and conferences on veterans' benefits; 5) attending expositions as requested by State Representatives and Senators in order to educate seniors on available veterans' benefits and current laws and regulations; 6) visiting veterans' medical hospitals and nursing homes, and the homes of veterans and their survivors who would like to apply for disability, death pensions, or disability compensation benefits; 7) ordering flags and flag holders for distribution to county veterans' organizations for placing on gravesites; and 8) creating necessary forms for veterans' benefits. (Doc. 23 ¶ 12; Doc. 29 ¶ 12.) Plaintiff also advised the County Commissioners concerning veterans' issues. (Doc. 23 ¶ 13; Doc. 29 ¶ 13.) Plaintiff was also in charge of the day-to-day operations of the office and supervising the staff. (Doc. 23 ¶¶ 16-17; Doc. 29 ¶¶ 16-17.) Plaintiff had the authority to negotiate and enter into contracts such as a co-op agreement with other counties for the purchase of flags. (Doc. 23 ¶ 20; Doc. 29 ¶ 20.)

In addition to a myriad of other activities, Plaintiff

prepared year-end reports to measure the productivity of the office and show the County Commissioners what the office was doing, how the caseload was increasing and serve as a basis for requests for more staff and more office space.  (Doc. 23 ¶¶ 21-39; Doc. 29 ¶¶ 21-39.)  Regarding hiring and firing, the parties dispute Plaintiff's authority: Plaintiff asserts he had no input into the decisions to hire or fire any employees but he could recommend persons for hire; Defendants asserting that Plaintiff had input into hiring and firing of the employees in his office and he hired three part-time employees.  (Doc. 23 ¶ 23; Doc. 29 ¶ 23; Doc. 29 CMF ¶¶ 16-17; Doc. 34 ¶¶ 16-17.)  Plaintiff made requests to the County Salary Board to up-grade job classifications of his current staff and the addition of new staff members because he believed the current staff was too small to address the needs of the County's aging population of 36,000 veterans and their families.  (Doc. 23 ¶ 40; Doc. 29 ¶ 40.)

Defendant Petrilla testified that Plaintiff was responsible for preparation and presentation of the annual budget for the Office of Veteran's Affairs, applying for and administering grants, and for the supervision of the employees in his office, including discipline.  (Doc. 29 CMF ¶ 8; Doc. 34 ¶ 8.)

Plaintiff had no day-to-day specific contact with individual members of the board of commissioners with respect to setting policies.  (Doc. 29 CMF ¶ 12; Doc. 34 ¶ 12.)  The parties dispute

whether Plaintiff "regularly" worked with the Commissioners and whether he was authorized to speak on their behalf. (Doc. 29 CMF ¶¶ 13-14; Doc. 34 ¶¶ 13-14.) Defendants highlight an interaction between Plaintiff and the Commissioners which occurred in October 2007. (Doc. 23 ¶ 14.) At that time Plaintiff told County officials, including the County Commissioners, that the County was going to see an increased demand on a variety of services as a result of the number of men and women returning from combat in Iraq and Afghanistan. (Doc. 23 ¶ 14; Doc. 29 ¶ 14.) Plaintiff stated that preparedness was advisable and gave examples of what might be done. (Doc. 23 ¶ 15; Doc. 29 ¶ 15; Doc. 25-1 at 67-71 (Pl's Dep. 66-70).)

One of the issues in this case concerns the County Commissioner's duty of ensuring that flags are purchased and placed on gravesites each Memorial Day. This activity was administered by the Veteran's Office under Plaintiff's leadership. (Doc. 23 ¶ 45; Doc. 29 ¶ 45.) Local veterans' organizations volunteer to place the flags and the County can reimburse them up to seventy-five dollars ($75.00) for refreshment and meals (Doc. 23 ¶ 46), Plaintiff adding that State law requires that Luzerne County reimburse the veteran's organizations (Doc. 29 ¶ 46). Plaintiff was responsible for authorizing the reimbursement of payments. (Doc. 23 ¶ 47; Doc. 29 ¶ 47.) The veteran would submit a written receipt or written request with the amount of money spent to

Plaintiff and a payment authorization form would be completed and the documentation attached, then Plaintiff would sign off on the payment. (Doc. 23 ¶ 48; Doc. 29 ¶ 48.) The executed payment authorization form and attached documents would then be sent to the County Controller's Office. (Doc. 23 ¶ 50; Doc. 29 ¶ 50.)

Luzerne County authorized Plaintiff to establish his own procedure for the utilization of receipts for the purpose of reimbursing the coffee and doughnut expenses of veterans who volunteer to place Memorial Day flags. (Doc. 29 CMF ¶ 45; Doc. 34 ¶ 45.) Defendants add that Plaintiff had used the procedure used for "40-plus years" at the office, that is, attaching a receipt to the submission for payment authorization. (Doc. 34 ¶ 45.) Defendant Petrilla testified that Luzerne County has a standard in place for acceptable receipt documentation but she did not know if it was written down anywhere. (Doc. 29 CMF ¶ 61; Doc. 34 ¶ 61.) Defendant Urban testified that he did not know whether the controller had a written policy requiring receipts for payment requests. (Doc. 29 CMF ¶ 62; Doc. 34 ¶ 62.) Although the practice was to attach a receipt, the payment request form at issue does not require the attachment of a receipt but does require a certification by the applicant. (Doc. 29 CMF ¶¶ 63-64; Doc. 34 ¶¶ 63-64.) Neither the Luzerne County Administrative Code nor the Luzerne County Personnel Policy contain provisions which apply to the situation at issue here. (Doc. 29 CMF ¶¶ 66-67; Doc. 34 ¶¶ 66-

67.)

Plaintiff had set a deadline of July 15, 2009, for the Memorial Day flag related food reimbursements, but had the right to change the deadline. (Doc. 23 ¶ 50; Doc. 29 ¶ 50.) In September 2009, John A. Brogna ("Brogna") sought reimbursement for expenses allegedly incurred at Perkins Restaurant on behalf of the Disabled Veterans of America, a group which assisted with 2009 Memorial Day cemetery decorating in the City of Pittston. (Doc. 23 ¶¶ 51-52.) Plaintiff adds that some of the expenses were incurred at a pizza restaurant. (Doc. 29 ¶¶ 51-52.) Plaintiff states that this receipt (for $40.00) was also misplaced. (Doc. 29 ¶ 33.) The Perkins receipt was also reportedly misplaced. (Doc. 23 ¶ 53; Doc. 29 ¶ 53.) Plaintiff reportedly advised Brogna to go back to the Perkins Restaurant and request a copy of the receipt. (Doc. 23 ¶ 54; Doc. 29 ¶ 54.) Brogna attempted to get a receipt but could not. (Doc. 23 ¶ 55; Doc. 29 ¶ 55.) Brogna returned to the office with a receipt from Perkins from another day which Plaintiff accepted and told the clerk to alter the receipt to reflect the date of May 31, 2009, and the amount $70.00 which Brogna said was the amount spent. (Doc. 23 ¶ 56; Doc. 29 ¶ 56.) The altered receipt was then attached to the payment authorization form for $70.00 and Plaintiff signed off on it and submitted it to the Controller's Office. (Doc. 23 ¶ 57; Doc. 29 ¶ 57.)

Sharon Roke, who worked at the Veterans' Affairs office in

2009 as a Clerk 2 (and had since the Fall of 2008) with duties which included functioning as a payroll clerk (Doc. 25-7 at 8 (Pape Dep. 7:10-18)), actually submitted the payment request at Plaintiff's direction. (Doc. 29 CMF ¶ 49.) Roke testified that she told Plaintiff she did not think he should send the receipt. (Doc. 34 ¶ 49.) In answer to the deposition question of whether "what was happening with respect to this particular Perkins document was a violation of the law or was wrong," Roke responded that "[i]t wasn't a smart move" and added "I didn't think he was breaking one of the Ten Commandments or anything like that." (Doc. 25-7 at 33 (Roke Dep. 32:2-7).) Roke received no discipline for submitting the payment request with the alteration, nor was she ever told that what she had done was wrong. (Doc. 29 CMF ¶ 53; Doc. 34 ¶ 53.)

The altered receipt was noted by the County Controller's Office, and a meeting was held with Plaintiff, Chief County Solicitor Vito DeLuca, County Manager/Chief Clerk Doug Pape, and County Human Resources Director Doug Richards attending. (Doc. 23 ¶ 58; Doc. 29 ¶ 58.) Plaintiff admitted to the alteration. (Doc. 23 ¶ 59; Doc. 29 ¶ 59.) Chief County Solicitor Vito DeLuca and County Manager/Chief Clerk Doug Pape recommended that Plaintiff be terminated for submitting an altered receipt for reimbursement (Doc. 23 ¶ 60), an assertion disputed by Plaintiff as being implausible (Doc. 29 ¶ 60). On September 24, 2009, Defendants

County Commissioners Petrilla and Urban voted to terminate Plaintiff at the public Commissioner's meeting. (Doc. 23 ¶ 61; Doc. 29 ¶ 61.) They testified that they would have taken the same action if the amount in question had been "five cents" or "twenty-five cents." (Doc. 29 CMF ¶¶ 46, 47; Doc. 34 ¶¶ 46, 47.) Pape similarly testified––if the payment request had been for "a dime, it would have warranted termination." (Doc. 29 CMF ¶ 48; Doc. 34 ¶ 48.)

Other than the initial meeting with DeLuca, Pape, and Richards, the only contact Plaintiff had with any county employee, officer, or official regarding this matter was a visit from a detective of the Luzerne County District Attorney. (Doc. 29 CMF ¶ 37; Doc. 34 ¶ 37.) No other representative of Luzerne County government ever contacted Plaintiff. (Doc. 29 CMF ¶ 38; Doc. 34 ¶ 38.)

Defendant Petrilla testified that in 2009 and before that some payment authorizations were paid for expenses directed to Luzerne County without having receipts. (Doc. 29 CMF ¶ 42; Doc. 25-2 at 30 (Petrilla Dep. 29:3-9).) Defendant Petrilla added that these employees did not submit false receipts; those expenses for which they could not produce receipts they had to personally pay back to the county. (Doc. 29 CMF ¶ 42; Doc. 25-2 at 30 (Petrilla Dep. 29:22-25).) These employees were not terminated. (Doc. 25-2 at 30 (Petrilla Dep. 29:17).) Defendant Urban made an unsuccessful

attempt (lack of second to his motion) to terminate involved employees and also sought their resignation. (Doc. 34 ¶ 42; Doc. 25-3 at 10 (Urban Dep. 30:21-25).) At a County Prison Board meeting, Defendant Urban made a motion to terminate former Warden Sam Hyder and the motion was seconded by Defendant Petrilla but did not pass. (Doc. 34 ¶ 42; Doc. 25-3 at 10 (Urban Dep. 31:1-5).) Urban testified that be believed Hyder was subject to termination because of his misuse of the debit card (using the card at a Las Vegas strip club) and his initial and subsequent denials of doing so. (Doc. 29 CMF ¶ 86; Doc. 34 ¶ 86; Doc. 25-3 at 10 (Urban Dep. 31:7-13).)

County Managers Sam Gusto and later Doug Pape supervised Plaintiff during his employment as the County's Director of Veteran's Affairs. (Doc. 29 CMF ¶ 2; Doc. 34 ¶ 2.) In 2009, Doug Pape was the county manager for Luzerne County. (Doc. 29 CMF ¶ 3; Doc. 34 ¶ 3.) Pape testified that Plaintiff had never done anything that was insubordinate or noncompliant with Pape's instructions while he supervised Plaintiff. (Doc. 29 CMF ¶ 91; Doc. 34 ¶ 91.)

Defendant Petrilla was aware that Defendant Urban was politically opposed to Commissioner Skrepenak in 2009.[2] (Doc. 29

---

[2] Gregory Skrepenak was the third Luzerne County Commissioner when Plaintiff was terminated. (Doc. 1 ¶¶ 25-26.) He resigned in December 2009 after being indicted on federal charges. http://the times-tribune.com/news/luzerne-commissioner-skrepenak-resigns-and-will-plead-guilty-1.495143 (Dec. 13, 2009).

CMF ¶ 4; Doc. 34 ¶ 4.)  Defendant Petrilla testified that she had

the impression that Plaintiff was a political affiliate of Mr.

Skrepenak's, adding that he was also a political supporter of hers

and she had no knowledge with whom Plaintiff was more closely

affiliated.  (Doc. 29 CMF ¶ 92; Doc. 34 ¶ 92; Doc. 25-2 at 8

(Petrilla Dep. 8:17-25).)  James Spagnola, who succeeded Plaintiff,

was aware that Plaintiff supported Commissioner Skrepenak

politically and was his friend.  (Doc. 29 CMF ¶ 5; Doc. 34 ¶ 5.)

Defendant Petrilla testified that political affiliation is

irrelevant to employment as the Luzerne County Director of

Veterans' Affairs.  (Doc. 29 CMF ¶ 19; Doc. 34 ¶ 19.)  Defendant

Petrilla answered affirmatively to the question "[d]id you perform

your service as a county commissioner at that time with the belief

that the position of the Director of Veterans Affairs should be

filled without reference to political affiliation of the

candidate?"  (Doc. 29 CMF ¶ 20; Doc. 34 ¶ 20; Doc. 25-2 at 20

(Petrilla Dep. 19:12-17).)  County Manager Pape testified that he

does not consider political affiliation an appropriate criteria for

selection for the position.  (Doc. 29 CMF ¶ 21; Doc. 34 ¶ 21.)  No

one from the commissioners or county management suggested to Pape

that political affiliation is an appropriate criteria for the

selection of someone to fill the position.  (Doc. 29 CMF ¶ 22; Doc.

34 ¶ 22.)  Political affiliation was not mentioned in Spagnola's

application process or during the course of his tenure as Director

of Veterans' Affairs.  (Doc. 29 CMF ¶¶ 23, 25; Doc. 34 ¶ 23, 25.)
Luzerne County Solicitor Vito DeLuca, Esq., testified that
political affiliation was not a proper factor to consider for the
selection of the director position, nor was it related to the
performance of the job.  (Doc. 29 CMF ¶¶ 26-27; Doc. 34 ¶¶ 26-27.)
Plaintiff testified that his political affiliation was not a proper
factor to be considered for the selection of an individual to fill
the position.  (Doc. 29 CMF ¶ 28; Doc. 34 ¶ 28.)

Plaintiff was born on October 19, 1958.  (Doc. 34 ¶ 29.)  His
successor, James Spagnola, was born on May 14, 1964.  (Doc. 34 ¶
30.)

Based on his termination, Plaintiff filed a Complaint in this
Court on September 23, 2011.  (Doc. 1.)  The Complaint contains
four counts: Count I asserting First and Fourteenth Amendment
violations pursuant to 42 U.S.C. § 1983 against all Defendants;
Count II asserting First and Fourteenth Amendment violations
pursuant to 42 U.S.C. § 1983 against Defendants Petrilla and Urban
in their individual capacities; Count III asserting Discrimination
on Account of Age pursuant to the Age Discrimination in Employment
Act ("ADEA"), 29 U.S.C. § 623(a) and 29 U.S.C. § 215; and Count IV
asserting Discrimination on Account of Age pursuant to the
Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 955(a).  (Doc.
1.)  The instant motion seeks summary judgment in Defendants' favor
on all claims.  (Doc. 20.)

## II. Discussion

### A.   *Summary Judgment Standard*

Summary judgment is appropriate when the movant demonstrates there is no "genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248). In determining whether a genuine issue of fact exists, a court must resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004) (citation omitted).

The initial burden is on the moving party to show an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citations omitted). The moving party may meet this burden by "pointing out to the district court [] that

13

there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." *Id.* at 325. The non-moving party may not rest on the bare allegations contained in his or her pleadings, but is required by Federal Rule of Civil Procedure 56 to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Id.* at 324. However, "to raise a genuine issue of material fact, the summary judgment opponent need not match, item for item, each piece of evidence proffered by the movant, but simply must exceed the 'mere scintilla' standard." *Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993); *Anderson*, 477 U.S. at 252). *Boyle* added

> [i]t is clear, however, that if a moving party satisfies its initial burden of proving a *prima facie* case for summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 . . . (1986). Rather, "[t]here must be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." *Arbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994).

139 F.3d at 393.

Where underlying facts are in dispute, the facts are viewed in

14

the light most favorable to the plaintiff.  *Abramson v. William Patterson College of N.J.*, 260 F.3d 265, 267 (3d Cir. 2001) (citing *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 854 N.1 (3d Cir. 1990).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence."  *Anderson*, 477 U.S. at 255.  Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

**B.    *Defendants' Motion***

Defendants assert they are entitled to summary judgment on all claims contained in Plaintiff's Complaint and the Complaint should be dismissed with prejudice.  (Doc. 20.)  Before analyzing the individual claims and the intricacies of the legal arguments involved, we will set out a brief summary of what we consider to be the nub of the case.

Plaintiff had a long-term association with former Luzerne County Commissioner Gregory Skrepenak, including working on his 2004 successful campaign for Luzerne County Commissioner. Thereafter (July 2005), the Commissioners, including Skrepenak and Defendant Urban (the minority commissioner at the time), appointed Plaintiff to the position of the Luzerne County Director of Veterans' Affairs.  In 2007, Defendant Petrilla joined Skrepenak on the Democratic ticket running for Luzerne County Commissioner.

15

Both were elected and Urban remained the minority commissioner.
Plaintiff asserts there came a time when Defendants Urban *and*
Petrilla were opposed to Skrepanak, an assertion we take as true
for summary judgment purposes only.  Defendants Petrilla and Urban
maintain Plaintiff's association with Skrepenak had nothing to do
with their decision to terminate him: the only reason was his
submission of an altered receipt with his request for payment of
veterans' group expenses related to distribution of Memorial Day
flags in 2009.  Plaintiff maintains his association with Skrepenak
played a role in his termination.  He also asserts that his age
played a role in his termination.

We now turn to a discussion of Plaintiff's specific claims and
the parties' arguments for and against summary judgment.

## 1.   **42 U.S.C. § 1983**

Counts I and II of Plaintiff's Complaint are brought pursuant
to 42 U.S.C. § 1983 asserting violations of the First and
Fourteenth Amendments of the United States Constitution based on
his rights of free speech and association.  We conclude Defendants
are entitled to partial summary judgment on these Counts.

To establish a § 1983 claim, a plaintiff must show that "the
defendant acted under color of state law, and, while so acting,
deprived the plaintiff of his rights under the Constitution or laws
of the United States."  *Galena v. Leone*, 638 F.3d 186, 197 (3d Cir.
2011).  Section 1983 is not a source of substantive rights but

16

provides a remedy for violation of a federal constitutional or statutory right. *Dique v. New Jersey State Police*, 603 F.3d 181, 185 (3d Cir. 2010) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)). Therefore, a plaintiff must identify the specific right violated in asserting a § 1983 claim.

As noted above, in Counts I and II Plaintiff points to his rights of association and free speech guaranteed by the First and Fourteenth Amendments to the United States Constitution as the bases for his § 1983 claims.[3] (Doc. 1 at 6-8.) We will review each basis of Plaintiff's First Amendment claims individually. Because the First Amendment is applied to the states through the Fourteenth Amendment, *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), we analyze Plaintiff's claim under First Amendment

---

[3] In his Complaint, Plaintiff makes the following related accusations: 1) before September 24, 2009, Plaintiff was politically affiliated with and associated with Gregory Skrepenak who, at all material times was a member of the Luzerne County Board of Commissioners (Doc. 1 ¶ 21); 2) before September 2009 Plaintiff openly campaigned for Skrepenak (Doc. 1 ¶ 22); 3) before September 24, 2009, Defendants Petrilla and Urban were politically opposed to Commissioner Skrepenak (Doc. 1 ¶¶ 23-24); 4) on September 24, 2009, Defendants Petrilla and Urban voted to terminate Plaintiff and Skrepenak dissented and Plaintiff was terminated on this date (Doc. 1 ¶¶ 25-26); 5) prior to the termination, Defendant Urban told Plaintiff that Plaintiff was "Skrepenak's boy" or words to that effect (Doc. 1 ¶ 29); 6) before Plaintiff's termination, Defendants Petrilla and Urban began a campaign of terminating the political allies of Gregory Skrepenak from their positions with Defendant County (Doc. 1 ¶ 30); 7) Plaintiff was terminated because of his political affiliation; and 8) Plaintiff's termination was in violation of Plaintiff's right of free speech and association as guaranteed by the First and Fourteenth Amendments (Doc. 1 ¶¶ 42, 44).

jurisprudence.

## a. **Association**

Plaintiff asserts in his Complaint that he was terminated in part because of his political affiliation with Gregory Skrepenak, a County Commissioner during the time at issue to whom Defendants Petrilla and Urban were politically opposed. (Doc. 1 ¶¶ 21-24, 30-31.) We conclude this claim is not properly dismissed at this stage of the litigation.

In order to make a prima facie case of political discrimination in violation of the First Amendment, a plaintiff must show the following: 1) he was employed at a public agency in a position that does not require political affiliation; 2) he was engaged in constitutionally protected conduct; and 3) this conduct was a substantial or motivating factor in the government's employment decision. *Galli*, 490 F.3d at 271 (citation omitted). Once a plaintiff makes this showing, a defendant "may avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity." *Id.* (citing *Stephens v. Kerrigan*, 122 F.3d 171, 176 (3d Cir. 1997); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Defendants argue they are entitled to summary judgment on Plaintiff's First Amendment association claim because his position was exempt from First Amendment protection, and, alternatively, the

18

County Commissioners would have made the same decision regardless of political association and the action is barred against Defendants Petrilla and Urban based on the doctrine of qualified immunity.  (Doc. 24 at 13-41.)

**(1)  Political Affiliation Requirement**

Defendants assert the Director of Veterans' Affairs is a policymaking position exempt from First Amendment protection. (Doc. 24 at 14.)  We conclude Defendants have not met their burden on this issue and, therefore, summary judgment on this basis is not appropriate.

In *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265 (3d Cir. 2007), the Third Circuit Court noted that the United States Supreme Court first clarified constitutional restraints on political patronage in *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980), which held that "termination of public officials because of their political affiliation violates the First Amendment unless the position at issue involves policymaking." *Galli*, 490 F.3d at 270.  The Third Circuit has a long line of cases addressing what has been referred to as the *Elrod-Branti* exception. *See*, *e.g.*, *Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).  Our Circuit Court explained the guidance on this issue provided to government officials through circuit case law in *Assaf v. Fields*, 178 F.3d 170, 177 (3d Cir. 1999).

> An employee may be terminated for political
> reasons only if "a difference in party

19

> affiliation [is] highly likely to cause an
> official to be ineffective in carrying out
> the duties and responsibilities of the
> office," *Wascovich* [*v. Morgano*, 2 F.3d 1292,]
> 1297 [(3d Cir. 1993)], . . . and only if an
> employee's duties make it possible to cause
> "serious political embarrassment," *id.* at
> 1302, will the position meet the narrow
> *Branti-Elrod* exception.

*Assaf*, 178 F.3d at 177. *Boyle* identified the underlying dual

goals: "to permit governmental entities to use political

affiliation where the governmental interest is 'overriding' and of

'vital importance,' while concomitantly protecting the individual's

right to freedom of association guaranteed by the First Amendment."

139 F.3d at 396 (citing *Elrod*, 427 U.S. at 362, 368; *Branti*, 445

U.S. at 515-16).

The burden of proof is on the public employer to demonstrate

an overriding interest and "[t]his burden is substantial."[4] *Boyle*,

---

[4] The Third Circuit Court of Appeals explained the burden
allocation in *Busa v. Township of Gloucester*, 458 F. App'x 174 (3d
Cir. 2012) (not precedential):

> While the usual allocation of the burden of
> proof in employment discrimination cases
> would place the burden solely on the
> plaintiff with only the burden of production
> shifting, *Stanziale v. Jargowsky*, 200 F.3d
> 101, 105 (3d Cir. 2000), in cases such as
> this the allocation of burdens is modified to
> require the defendant to demonstrate an
> overriding interest in encroaching on a
> constitutional right, *Armour v. Cnty of
> Beaver*, 271 F.3d 417, 420 (3d Cir. 2001).

458 F. App'x at 177 n.6. *Boyle v. County of Allegheny
Pennsylvania*, 139 F.3d 386, 397 (3d Cir. 1998).

139 F.3d at 397; *see also Galli*, 490 F.3d at 271 (citing *Armour v. Cnty of Beaver*, 271 F.3d 417, 420 (3d Cir. 2001)). *Boyle* added that "the intermediate 'exacting' level of scrutiny must be applied, [*Elrod*, 427] at 362, 96 S. Ct. at 2684. Thus, the interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest." 139 F.3d at 395. *Galli* outlined the appropriate inquiry.

> While permitted political patronage lies in a gray area, employers are allowed to make employment decisions based on political affiliation when "policymaking" positions are at issue; however, "[n]o clear line can be drawn between policymaking and nonpolicymaking positions." *Elrod*, 427 U.S. at 367. In *Brown v. Trench*, our Court clarified this line by setting out several factors that should be considered when determining whether political affiliation is an appropriate precondition for a government position. 787 F.2d 167, 169 (3d Cir. 1986). These factors include whether the employee has duties that are non-discretionary or non-technical, participates in discussions or other meetings, prepares budgets, possesses the authority to hire and fire other employees, has a high salary, retains power over others, and can speak in the name of policymakers. *Id.* The "key factor seems to be not whether the employee was a supervisor or had a great deal of responsibility[,] but whether [she] has meaningful input into decisionmaking concerning the nature and scope of a major [ ] program." *Armour* [v. *County of Beaver, Pa.*], 271 F.3d [417,] 429 [(3d Cir. 2001)] (citations and quotations omitted).

*Galli*, 490 F.3d at 271. Our Circuit Court has also advised that

district courts are

> to look at the "function[s] of the office in
> question and not the actual past duties of
> the particular employee involved." *Peters
> v. Delaware River Port Authority*, 16 F.3d
> 1346, 1353 (3d Cir. 1994); *Brown v. Trench*,
> 787 F.2d 167, 168 (3d Cir. 1986); *O'Connor
> v. Steeves*, 994 F.2d 905, 911 (1ˢᵗ Cir.
> 1993). ("[T]he actual past duties of the
> discharged employee are irrelevant if the
> position inherently encompasses more
> expansive powers and more important
> functions that would tend to make political
> affiliation an appropriate requirement for
> effective performance.") . . . Although,
> actual duties are not determinative, they
> may be informative.

*Boyle*, 139 F.3d at 397.

Defendants assert that "whether a position is one requiring a
certain political affiliation is a question of law for the court to
decide." (Doc. 35 at 7 (citing *Ness v Marshall*, 660 F.2d 517, 522
(3d Cir. 1981)).) We disagree with this proposition. Rather, *Ness*
instructed that the issue *could* be decided on summary judgment.
660 F.2d at 522. However, in general explanation, the Circuit
Court quoted its earlier discussion of the Supreme Court's comment
in *Elrod* concerning the difficulty of drawing a line between
policymaking and nonpolicymaking positions:

> [T]he determination of status as a
> policymaker vel non presents a difficult
> factual question. Where there is evidence
> to support the employee's claim that he does
> not make policy, as there is here, he is
> entitled to a full trial on the issue.
> Indeed, the state bears the burden of
> persuasion on that question at trial.
> Certainly, then, it was improper for the

22

> district court to weigh the evidence and
> rule against [the plaintiff] on this issue
> on a Rule 56 motion.

*Ness*, 660 F.2d at 522 (quoting *Rosenthal v. Rizzo*, 555 F.2d 390, 394 n.5 (3d Cir. 1977) (finding that "evidence as to the nature of Rosenthal's duties, in the form of depositions, was imprecise and cut both ways" and therefore the district court's apparent weighing of evidence and resolution of the issue on motion for summary judgment was improper)). *Boyle* stated that, although summary judgment may be appropriate in certain circumstances, 139 F.3d at 397 (citing *Ness*, 660 F.2d at 521), "[t]he question of whether an employee falls within the *Elrod/Branti* exception is generally one of fact," 139 F.3d at 397 (citing *Furlong v. Gudnecht*, 808 F.2d 233, 235 (3d Cir. 1986); *Rosenthal*, 555 F.2d at 393 n.5).

Here Defendants deny political affiliation played any role in their decision. (Doc. 24 at 14 n.3.) Their argument on this issue is that, even if it were to be found that political affiliation played a role in Plaintiff's termination, he would not be entitled to First Amendment protection because his job as Director of Veterans' Affairs was a policymaking position. Citing *Waskovich v. Morgano*, 2 F.3d 1292, 1302 (3d Cir. 1993), as holding that the position of Director of Veterans' Administrative Services was a position exempt from First Amendment protection, Defendants assert that the factors considered in *Waskovich* are relevant here and warrant the same conclusion. (Doc. 24 at 16-33.) The areas

23

*Waskovich* considered in determining the nature of the responsibilities are: 1) the applicable statutory framework; 2) the functions actually performed by the director; and 3) the relevance of political affiliation. 2 F.3d at 1298-1303.

We do not reach the factors outlined in *Waskovich* and *Galli* based on the Third Circuit's decision in *Boyle* which we find controlling at this stage of the proceedings. Similar to the case at bar, the *Boyle* defendants denied the plaintiff was terminated for his political affiliation and moved for summary judgment arguing that, even if he were, the termination was proper under the *Elrod-Branti* exception. 139 F.3d 389. The plaintiff largely relied on the deposition testimony of two of the three members of the Allegheny County Board of Commissioners who testified that political affiliation was not an appropriate requirement for the plaintiff's position, Deputy Director of Marketing and Communications. *Id.* The district court granted summary judgment after concluding that the deposition testimonies were not significantly probative on the issue of whether political affiliation was an appropriate requirement for the position. *Id.* The Third Circuit Court reversed, framing the issue as whether summary judgment was appropriate when "statements [were] made by the relevant hiring authority to the effect that a particular political affiliation was not an appropriate requirement for the particular position." 139 F.3d at 394. In the issue of first

impression for the circuit, the Third Circuit Court applied an

analysis which differed from the formulations previously developed

by the Supreme Court and the Third Circuit.  *Id.*

> While the ever evolving formulations
> developed by the Supreme Court and this court
> are to be applied in cases which present no
> conflicting testimony from members of the
> hiring authority, we believe that a rigid
> application of such tests under the
> circumstances of this case would render the
> relevant analysis overly formalistic and not
> consonant with the principles and rationales
> underlying the development of the law in the
> area of political patronage.

*Id.*  Finding that the existence of the deposition testimonies

removed the case from the ordinary political patronage cases, *Boyle*

noted that the case law developed in this area "has generally not

involved a similar situation where a hiring authority specifically

testifies that political affiliation is not an appropriate

requirement for a particular position."  *Id.* at 397.  "In resolving

this issue, then, it is important to keep in mind that the

touchstone of political patronage is that the '*hiring authority*

[must] demonstrate that the party affiliation is an appropriate

requirement for the effective performance of the public office

involved.'"  *Boyle*, 139 F.3d at 397 (quoting *Branti*, 445 U.S. at

518).

    *Boyle* distinguished *Waskovich* on the basis that the proffered

testimony of two government officials that political affiliation

was not a proper requirement for the New Jersey Director of

Veterans' Administrative Services did not come from the hiring authority. 139 F.3d at 398 (citing *Waskovich*, 2 F.3d at 1301). In *Wascovich*, the court held the deposition testimony did not create a genuine issue of material fact in the absence of such testimony from the Adjutant General, the individual vested with the statutory authority to hire or fire the Director, reasoning that the "question . . . must focus on whether the Adjutant General, as the hiring authority, had a valid basis to prefer an individual of one political party over another." 139 F.3d at 398 (citing *Wascovich*, 2 F.3d at 1302).

Noting that "[t]he notion that statements made by members of a hiring authority--to the effect that political affiliation is not a proper consideration in hiring or firing--constitute probative evidence is consonant with the rationale and policy underlying the *Elrod-Branti* exception," 139 F.3d at 400, *Boyle* summarized the court's consideration of the issue.

> [P]olitical patronage is a practice which primarily benefits those political entities that invoke the privilege. When those political entities themselves testify that political affiliation is or should not be an important consideration, as in this case, such evidence, at the very least, creates a genuine issue of material fact precluding summary judgment. Put another way, if the hiring authority is obligated to demonstrate that political affiliation is an appropriate requirement for a particular position, then we cannot say how its own statements relating directly on the issue can be considered anything less than probative. The appellee's arguments, to the effect that the testimonies

26

of the two Commissioners should be ignored
and the court should rely solely on the
inherent functions of the position in
question, exalts form over substance in the
context of this case, rendering the analysis
called for under *Elrod*, *Branti* and their
progeny overly formalistic.  The significant
encroachment upon First Amendment rights by
the practice of political patronage does not
justify such an approach.

139 F.3d at 401.

Here we do not have the testimony of a majority of the decisionmaking body, the Luzerne Count Board of Commissioners, as did the plaintiff in *Boyle*.  Rather we have testimony from one Commissioner, Defendant Petrilla, and others in county administrative positions, all of whom opined that political affiliation is not an appropriate consideration for the Luzerne County Director of Veterans' Affairs.  (Doc. 29 CMF ¶¶ 19-22, 26-27.)  There is no directly conflicting testimony from a decisionmaker or any other county official.  Under the guidance of *Boyle*, the testimony of non-decisionmaking administrators is not probative of the political affiliation issue.  However, the testimony of Defendant Petrilla, as a decisionmaker, is probative.

Defendant Petrilla testified as follows:

Q.  Did you believe that the position you
were filling with Mr. Spagnola [successor to
Plaintiff as Luzerne County Director of
Veterans' Affairs] was one that was
appropriate to consider his political
affiliation?

A.  I never inquired as to his political
affiliation.  It was irrelevant.

27

. . . .

> Q. Did you perform your service as a county commissioner at that time with the belief that the position of the Director of Veterans' Affairs should be filled without reference to political affiliation of the candidate"

> A. Absolutely.

(Doc. 25-2 at 19, 20 (Petrilla Dep. 18:9-16, 19:12-17).)

Although testimony from a majority of the Commissioners would put this case squarely under the holding in *Boyle*, we conclude that the distinction is not dispositive based on the Circuit Court's reasoning and framing of the issue in *Boyle*––nowhere in *Boyle* does the Circuit Court indicate that only testimony from a majority of a decisionmaking body should be considered probative. As noted previously, Defendants do not proffer any testimony which conflicts with Defendant Petrilla's direct statement on the issue. Defendants proffer no other evidence which suggests that either of the other decisionmakers, Defendant Urban and Gregory Skrepenak, believed that political affiliation was a valid consideration for the position.

Discounting reliance on *Boyle*, Defendants maintain that *Wascovitch* should be controlling. (Doc. 35 at 10-13.) In addition to there being a lack of testimony from a majority of the decisionmaking body, Defendants aver that Defendant Petrilla's testimony was not a direct statement about political affiliation but "rather was qualified with regard to how she performed her

28

services as County Commissioner." (Doc. 35 at 10.) While this language may not be as direct as that of the commissioners in *Boyle*, 139 F.3d at 392, we cannot conclude its meaning should be limited to the degree urged by Defendants. We detect no equivocation on the part of Defendant Petrilla in her responses to the questions asked at her deposition regarding the relationship of political affiliation to the Luzerne County Director of Veterans' Affairs position. Similarly, we detect no attempt on the part of Plaintiff's counsel to pose questions in such a way as to elicit a response favorable to his client. Considered contextually, we find Defendant Petrilla's responses relate directly to the issue and negate a connection between political affiliation and the position at issue. Therefore, Defendant Petrilla's testimony cannot "be considered anything less than probative." *Boyle*, 139 F.3d at 301.

Defendants also seek to undermine reliance on *Boyle* based on the differences in the positions at issue. (Doc. 35 at 11.) Defendants maintain that where *Boyle* considered the Deputy Director of Marketing Communications, *Wascovich* presents controlling similarities in that it deals "with the same position, functions, discretion and public interaction at issue here." (Doc. 35 at 11.) The position titles in this case and *Wascovich* are similar, but the relevant statutory frameworks are completely different: the *Wascovich* Director being a New Jersey state-wide position compared to the Pennsylvania county position at issue here. The breadth of

29

responsibilities, and therefore the potential functions, of the New Jersey position are more broad--the New Jersey statute talking in terms of "supervise" "operate" and "establish," N.J. Stat. Ann. § 38A:3-2b, where the Pennsylvania statute primarily uses the word "assist," 16 P.S. § 1923.  Thus, although we recognize similarities between *Waschovich* and the case at bar, we disagree with Defendants that they are "controlling similarites" (Doc. 35 at 11) which dictate the outcome of this issue as a matter of law.

We also recognize that evidence in this case cuts both ways. For example, in addition to Defendant Petrilla's testimony about political affiliation, she testified that Plaintiff was responsible for "preparing his annual budget, presenting it[,] . . . applying for grants, administering grants[,] supervision of the employees in his office, [and] disciplining those employees" in response to the request that she describe "the extent to which Mr. Wren was authorized to make policy for the county with respect to veterans affairs."  (Doc. 25-2 at 18 (Petrilla Dep. 17:4-12).)  This testimony shows that Plaintiff was authorized to make policy to some extent.  But keeping in mind that the "key factor seems to be not whether the employee was a supervisor or had a great deal of responsibility, but whether he has meaningful input into decisionmaking concerning the nature and scope of a major program," *Armour*, 271 F.3d at 429, and "that the touchstone of political patronage is that 'the *hiring authority* [must] demonstrate that the party affiliation is an appropriate requirement for the effective

30

performance of the public office involved,'" *Boyle*, 139 F.3d at 397 (quoting *Branti*, 445 U.S. at 518), it is obvious in this case that evidence is to be weighed. And this the Court cannot do.

While we make no decision on the ultimate resolution of this issue by a jury, our conclusion is consistent with guidance that the *Elrod-Branti* exception is to be construed narrowly. *See*, *e.g.*, *Assaf*, 178 F.3d at 177. Other District Court cases further support our determination that this issue presents a question of fact for a jury. In *Scott v. Sills*, 134 F. Supp. 2d 599 (D. Del. 2001), where the position at issue was director of the Wilmington Economic Development Corporation, the court concluded testimony from some decisionmakers that the position was not one for which political affiliation was an appropriate consideration precluded summary judgment on the issue pursuant to *Boyl*e. *Scott* did not discuss the need for a majority of decisionmakers to offer such testimony in order to be considered probative. In *Bell v. Lackawanna County*, Civil Action No. 3:08-CV-1926, 2012 WL 3782550, at *11 (M.D. Pa. Aug. 31, 2012) (Conner, J.), where one of the positions at issue was the Director of Veterans' Affairs of Lacakwanna County, Pennsylvania, Judge Conner found that the same statute which is controlling here, 16 P.S. § 1923, did not vest the Director of Veterans' Affairs with policymaking functions based in part on the statutory language describing the director's duties as primarily to

"assist" the commissioners.[5]  2012 WL 3782550, at *11.

## (2) Same Decision Defense

Defendants assert that, assuming *arguendo* Plaintiff can establish that his position was one for which political association is not an appropriate requirement and that he can further establish that his political association with former Commissioner Gregory Skrepenak was a substantial or motivating factor in Plaintiff's termination, they are nonetheless entitled to summary judgment on Plaintiff's association claim because they would have made the same decision regardless of his political association.  (Doc. 24 at 33.) We conclude the Court cannot make this determination as a matter of law.

As set out above, once a plaintiff makes the required prima facie showing, a defendant "may avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity."  *Galli*, 490 F.3d at 271, (internal quotation and

---

[5]  Defendants discount *Bell* because it was decided on the basis of Pennsylvania law.  (Doc. 35 at 12.)  *Bell* cited *Adams v. Rodfong*, 7 Pa. D & C.3d 463 (Pa. Comm. Pl. 1978), as holding that the Beaver County Director of Veterans' Affairs was not a policymaking position because 16 P.S. § 1923 does not vest the position with policymaking functions.  2012 WL 3782550, at *11. The *Adams* determination was made in the context of deciding whether the official was entitled to high government official immunity.  7 Pa. D & C.3d at 467.  Although this context differs from that considered here, the "policymaking" aspect of the decision from a Pennsylvania Court interpreting the Pennsylvania statute at issue is relevant to the matters presented in *Bell* and in the case at bar.

citations omitted). In proving they would have made the same decision, defendants must show that "the protected conduct was *not* the but-for cause" of the action. *Suppan v. Dadonna*, 203 F.3d 228, 236 (3d Cir. 2000). The rationale for this approach is that the plaintiff "is entitled to the extent practicable to be put in the position that he would have been in had he not engaged in that protected conduct." *Id.*

We presume for the sake of argument (as Defendants have (Doc. 24 at 33)) that Plaintiff can satisfy the elements of his prima facie case. Turning to the application of the *Galli*/*Suppan* formulation set out above to the facts of this case, Defendants are entitled to summary judgment based on the same decision defense if they can show by a preponderance of the evidence that Plaintiff's association with Skrepenak was not the but-for cause of his termination.

Defendants have produced evidence from which a reasonable jury *could* conclude they would have made the same decision, that is, the decision to terminate Plaintiff, even if Plaintiff had not been politically affiliated with Gregory Skrepenak. We are cognizant of the political climate in Luzerne County during the relevant time period (*see*, *e.g.*, Doc. 25-3 at 10 (Urban Dep. 29:5-11)) and recognize there is no question that Plaintiff submitted an altered receipt with his request for reimbursement to the veterans' group (Doc. 23 ¶ 59; Doc. 29 ¶ 59).

Plaintiff has also produced evidence from which a reasonable jury *could* conclude that Defendants' stated motives are suspect. No receipt policy was written. (Doc. 29 CMF ¶¶ 61, 62; Doc. 34 ¶¶ 61, 62.) Plaintiff had the authority to establish policy within his department for the submission of payment requests for the Memorial Day flag volunteers. (Doc. 29 CMF ¶ 45; Doc. 34 ¶ 45.) There is no evidence that the underlying expenditure was nonexistent or improper. Others in the county who had submitted improper payment requests were not terminated. (*See*, *e.g.*, Doc. 25-3 at 10 (Urban Dep. 30:15-31:13).)

We conclude evidence exists for Plaintiff to cast sufficient doubt on Defendants' stated termination motivation that we cannot say as a matter of law that Defendants have shown by a preponderance of the evidence that they would have made the same decision if Plaintiff had not been associated with Skrepenak. Faced with conflicting evidence (which is by way of example) and credibility matters, the decision of what to credit and what to reject is for the jury. Therefore, summary judgment on this issue is not appropriate.

**(3) Qualified Immunity**

Defendants next argue they are entitled to qualified immunity, and therefore summary judgment, on Plaintiff's First Amendment association claim. We disagree.

"The doctrine of qualified immunity protects government

34

officials 'from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It reflects the "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court mandated a two-step qualified immunity analysis--first, whether "the facts alleged show that the [official's] conduct violated a constitutional right," and, second, whether the right, if violated, "was clearly established." In *Pearson*, the Court backed away from the previously-mandated sequence, stating, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." 555 U.S. at 236.

The inquiry into whether a right was clearly established must be undertaken in light of the specific context of the case. *Saucier*, 533 U.S. at 201. "The relevant dispositive inquiry into whether a right is clearly established is wether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Id.* at 202 (citation omitted). Thus, although the analysis is undertaken from an objective perspective, specific circumstances play a vital role in determining objective

reasonableness. *See, e.g., Southerland v. Pennsylvania*, 389 F. App'x 166, (3d Cir. 2010) (not precedential) ("[T]he question is whether 'in light of pre-existing law,' the 'contours' of the plaintiff's rights were sufficiently clear that the unlawfulness of the officer's conduct, in the specific circumstances that he confronted, would have been apparent to a reasonable person." (quoting *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000)).)

A defendant has the burden of establishing entitlement to qualified immunity. *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004). The court must consider the facts alleged in the light most favorable to the plaintiff. *Saucier*, 533 U.S. at 201.

We conclude that Defendants are not entitled to qualified immunity because the right at issue, the right not to be terminated based on political affiliation unless the *Elrod-Branti* exception applies, was firmly established at the time Plaintiff was terminated. *See, e.g., Assaf*, 178 F.3d at 177. Defendants' assertion regarding the applicability of *Wascovitch* is essentially an argument that a reasonable person in the position of a Luzerne County Commissioner would have believed the *Elrod-Branti* exception applied to the County Director of Veterans' Affairs position given the specific facts of this case. We reject this argument.

First, Defendants have not met their burden of showing that a reasonable decisionmaker would have believed the *Elrod-Branti* exception applied based on *Wascovich*. This is so for several

reasons: 1) it was clearly established in 2009 that whether the exception applied was a fact specific inquiry, *see*, e.g., *Zold v. Township of Mantua*, 935 F.2d 633, 635 (3d Cir. 1991); 2) it was clearly established in 2009 under *Boyle* that a decisionmaker's belief that political affiliation was not an appropriate consideration for a position is relevant to the inquiry of whether the position is exempt from First Amendment protection; and 3) given the first and second considerations, a reasonable government official would not have assumed *Wascovich* was controlling in light of the previously discussed distinctions between *Wascovich* and the case at bar.

Second, the specific facts of this case include the fact that at least one of the decisionmakers testified that, during the relevant time period, she did not believe political affiliation was an appropriate consideration. (Doc. 29 CMF ¶¶ 19, 20; Doc. 34 ¶¶ 19, 20.) Thus, the question is whether a reasonable person could believe the exception applied where at least one member of the decisionmaking body and the chief county solicitor did not believe the position in question was one for which political affiliation was an appropriate consideration.[6] We think not.

---

[6] We consider County Solicitor Vito DeLuca's testimony relevant on this issue: if a commissioner were to seek the advice of counsel on the issue of whether political affiliation were an appropriate consideration for Plaintiff's position, he or she would have been informed that it was not an appropriate consideration in that solicitor's belief. (*See* Doc. 29 CMF ¶¶ 26, 27; Doc. 34 ¶¶ 26, 27.)

Because the objective reasonableness of believing that *Wascovich* applied in this situation is seriously undermined, Defendants have not shown that they are entitled to qualified immunity on Plaintiff's First Amendment association claims, and summary judgment on these claims in Counts I and II is not appropriate.

**b. Speech**

Defendants assert they are entitled to summary judgment on Plaintiff's First Amendment speech claims. We agree.

To state a First Amendment retaliation claim, a plaintiff must allege two things: "(1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006) (citing *Hill v. City of Scranton*, 411 F.3d 305, 310 (3d Cir. 2004)). The first factor is a question of law, the second a question of fact. *Id.* (citing *Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir. 2004)). "A defendant may defeat the plaintiff's claim by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected conduct." 455 F.3d at 241 n.23 (citing *Mt. Healthy*, 429 U.S. at 287).

Analyzing the first element of a First Amendment speech claim, a public employee's speech is protected activity where "(1) in

making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made."  *Hill*, 455 F.3d at 241-42 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

Defendants first argue that Plaintiff's notice to veterans about a budget meeting is not protected speech because it was not made in his capacity as a citizen (Doc. 24 at 43-45), and a reasonable jury could not find his 2004 campaign hat design a substantial or motivating factor in his termination because of the lapse in time between that action and his termination (Doc. 24 at 46-47).  Defendants also maintain they would have made the same decision regardless of his allegedly protected speech (Doc. 24 at 48).

Plaintiff does not directly refute Defendants' assertion that they are entitled to summary judgment on his First Amendment speech claims.  However, he addresses these claims in a footnote. Regarding the "substantial or motivating factor" element of his prima facie case, Plaintiff states

> Defendants do argue this point with respect to Mr. Wren's political speech.  However, Defendants do not detail the evidence of Mr. Wren's political speech.  He testified he was confronted by Commissioner Urban after having been seen passing out campaign literature. (Wren 120:8-15; 122:3-13)  Thereafter, Commissioner Urban accused him of being in bed with Skrepenak or that he was one of his

39

> boys, or words to that effect. (CSMF 93) As
> to the Skrepenak campaign hat activity on the
> part of Mr. Wren, the fact that this occurred
> earlier in time does not mean it was not a
> motivating factor. . . . Commissioner Urban
> could not act against Mr. Wren until
> Commissioner Skrepenak became politically
> powerless due to issues leading to his
> indictment and conviction.

(Doc. 28 at 25 & n.7.)

In their reply brief, Defendants address Plaintiff's "claims that he was discriminated against by Mr. Urban for passing out campaign literature at the polls, placing signs and attending fund raising functions in 2004 on behalf of the Friends of Skrepenak & Vonderheid." (Doc. 35 at 14 (citing Doc. 28 at 25-26 n.7; Doc. 25-1 at 121).) Defendants conclude that, like the hat design, all of Plaintiff's 2004 speech claims fail because of the five year lapse of time between the speech and his termination. (Doc. 35 at 15.)

We agree with Defendants that Plaintiff's claims regarding notification of the budget meeting and the 2004 hat design do not support his First Amendment Speech claim. Plaintiff does not properly refute Defendants' arguments regarding these claims and we concur with Defendants' assessments.

Similarly, any claim related to the 2004 campaign is subject to the same analysis as the 2004 hat claim, *i.e.*, for a plaintiff to prove his protected conduct was a substantial or motivating factor in the adverse employment decision, he must establish a causal link. To establish a causal link, "'a plaintiff usually must prove either (1) an unusually suggestive temporal proximity

40

between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.'" *Kovac v. Pennsylvania Turnpike Com'n*, 444 F. Appx. 588, 590 (3d Cir. 2011) (not precedential) (quoting *Lauren W. ex. rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). *Kovac* further explained that in the absence of these elements, the Third Circuit Court has held that evidence of causation may be gleaned from the record as a whole. 444 F. App'x at 588 (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). "In addition, summary judgment may be defeated when 'a reasonable inference can be drawn that an employee's speech was at least one factor considered by an employer in deciding whether to take action against the employee.'" *Kovac*, 444 F. App'x 588 at 590-91.

As noted above, Plaintiff does not properly refute Defendants' temporal proximity argument regarding the 2004 campaign hats. In that Plaintiff points to other 2004 allegedly protected speech, we review his claim pursuant to the *Kovac* guidance and conclude his First Amendment claim fails because of the remoteness in time, lack of other supportive evidence in the record gleaned from our review of Plaintiff's cited testimony, and the lack of any reasonable inference that Plaintiff's 2004 allegedly protected speech was a factor in the decision to terminate him in 2009.

Defendants do not address Plaintiff's allegations regarding

41

allegedly protected speech in 2007 or an alleged verbal exchange with Defendant Urban. Although the portions of Plaintiff's deposition testimony cited in support of his speech claims (Doc. 25-1 at 121, 122 (Wren Dep. 120:8-15, 122:3-13)), are less than clear, we conclude the allegations vaguely made therein do not support a First Amendment speech claim. His allegations regarding Defendant Urban's comments (*see* Doc. 29 CMF ¶ 93) are similarly unavailing.

We conclude that causal connection is lacking because the 2007 campaign activity, undertaken on behalf of Defendant Petrilla as well as Skrepenak, at most reflects upon Defendant Urban's motivation. At the time, Plaintiff was working *on behalf of* the Skrepenak/Petrilla ticket. While a reasonable juror might find that Defendant Urban acted in part in retaliation against Plaintiff for supporting a political adversary, Plaintiff has produced no evidence from which a reasonable juror could find the same as to Defendant Petrilla. As the decision to terminate took both Defendants' votes, the record does not support a finding that the allegedly protected activity in 2007 was a substantial or motivating factor in the decision to terminate Plaintiff.

We further conclude that the vague allegations relating to Defendant Urban's comments do not support Plaintiff's First Amendment speech claim. The scant testimony provided on this issue indicates that, at some time while he was the Veterans' Affairs Director, Plaintiff questioned Defendant Urban about why he had

made statements to the effect that Plaintiff "was in bed with Skepenak" or "one of his boys." (Doc. 25-1 at 125 (Wren Dep. 124:16-125:5).) As reported, this cannot be considered speech involving a matter of public concern as is required for First Amendment protection. *Hill*, 455 F.3d at 241-42. Therefore, it cannot serve as a basis for Plaintiff's First Amendment speech claim.[7]

Because Plaintiff has failed to point to evidence from which a reasonable juror could conclude that his speech was a substantial or motivating factor in Defendants' decision to terminate him, Defendants are entitled to summary judgment on Plaintiff's First Amendment speech claims.

c. **Municipal Liability Claims**

Defendants argue that because Plaintiff cannot establish a constitutional violation perpetrated by Defendants Petrilla and Urban, he cannot establish a constitutional violation perpetrated by Defendant Luzerne County. (Doc. 24 at 49.) Based on our findings on Plaintiff's association and speech claims, Plaintiff's First Amendment claim against Luzerne County in Count I goes forward insofar as it is based on his association rights and fails insofar as it is based on his free speech rights.

d. **Substantive Due Process Claims**

Defendants maintain Plaintiff's Fourteenth Amendment

---

[7] With this finding, we need not reach Defendants' same decision defense.

substantive due process claims in Counts I and II must be dismissed. (Doc. 24 at 48.) We do not read Plaintiff's Complaint to assert independent substantive due process rights in public employment. Plaintiff does not address this issue in his responsive brief. Therefore, without further discussion, we agree with Defendant to the extent that if such a claim is made it is properly dismissed.

## 2. Age Discrimination

Count III of Plaintiff's Complaint sets out a claim for a violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a) and 29 U.S.C. § 215. Count IV sets out a claim for age discrimination under the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 955(a). For the reasons discussed below, we conclude that further briefing regarding Plaintiff's age discrimination claims is required.

Defendants maintain that Plaintiff's age discrimination claims must be dismissed for several reasons. First, Plaintiff's position was exempt from ADEA protection because he held a political appointee policymaking level position. (Doc. 24 at 49.) Second, because Plaintiff has advanced multiple theories of discrimination as the bases for his discrimination claims, he cannot show that his age was the "but for" cause of his termination as his required by the ADEA. (Doc. 24 at 55.) Third, Plaintiff has not adduced evidence from which a reasonable jury could conclude the reason given for Plaintiff's termination--submission of an admittedly

44

falsified receipt for reimbursement--was a pretext for discrimination. (Doc. 24 at 56.) Defendants do not argue that Plaintiff cannot establish a prima facie case of age discrimination.

Upon review of the parties' briefs and the entire record, we conclude that proper consideration of Plaintiff's age discrimination claims includes consideration of the prima facie case. Therefore, the Court requires further briefing concerning the required showing to make out a prima facie case of age discrimination under the ADEA and PHRA. With this conclusion, the parties are on notice that they are to come forward with all of their evidence related to the prima facie age discrimination case. A schedule for such briefing will be set out in the accompanying Order.

### III. Conclusion

For the reasons discussed above, Defendants' County of Luzerne, Maryanne C. Petrilla and Stephen A. Urban's Motion for Summary Judgment (Doc. 20) is granted in part, denied in part, and held in abeyance in part. The motion is granted insofar as Plaintiff's First Amendment free speech claims are dismissed from Counts I and II; the motion is denied insofar as Plaintiff's First Amendment association claims in Counts I and II go forward as to the Defendants identified in each claim. The motion is held in abeyance on Plaintiff's age discrimination claims in Counts III and IV. A decision on these claims will be rendered following required

briefing.  An appropriate Order will be filed simultaneously with this motion.

                              S/Richard P. Conaboy
                              RICHARD P. CONABOY
                              United States District Judge


DATED: February 8, 2013_____